IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Thomas Farrier,
            Petitioner               :

                               :

        v.                       :   No. 74 C.D. 2021

                               :   Submitted: December 3, 2021

Lee's Painting and Roof Coating   :

(Workers' Compensation Appeal    :

Board),                        :

            Respondent      :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                          FILED: March 22, 2022

Thomas P. Farrier (Claimant) petitions this Court for review of the December 29, 2020 order of the Workers' Compensation Appeal Board (Board), affirming the decision of a workers' compensation judge (WCJ), Terry Knox (Judge Knox), which terminated Claimant's benefits under the Workers' Compensation Act (Act)[1] on the basis that he had fully recovered from a work injury sustained on May 6, 2011. Claimant argues on appeal that Judge Knox's decision granting the termination petition of Lee's Painting and Roof Coating (Employer) contradicts the findings of a WCJ from a prior termination proceeding. After review, we affirm.

## I. Background

### A. Claim and First Termination Proceeding

The circumstances of Claimant's work injury are not in dispute. Claimant worked as a painter for Employer. Certified Record (C.R.), Item No. 30, October

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 1-1041.4, 2501-2710.

22, 2013 WCJ Decision (First WCJ Decision), Finding of Fact (F.F.) No. 19. Claimant suffered a work injury on May 6, 2011, after falling from a roof. F.F. No. 4. Claimant's injury consisted of a laceration to his head requiring stitches, a rupture of the infrapatellar tendon in his right knee, an injury to Claimant's previously reconstructed right anterior cruciate ligament (ACL), and a fractured left ankle. F.F. No. 20. A WCJ, James Stapleton (Judge Stapleton), granted Claimant total disability benefits under the Act from May 6, 2011, ongoing. Conclusion of Law (C.O.L.) No. 6. As Employer did not have workers' compensation insurance, the Uninsured Employers Guaranty Fund (UEGF) would pay Claimant's benefits should Employer fail to do so.[2] F.F. No. 10. The Board affirmed the WCJ on November 6, 2014. This Court affirmed the Board in *Staron v. Workers Compensation Appeal Board (Farrier)*, 121 A.3d 564 (Pa. Cmwlth. 2015).

On April 17, 2017, the UEGF filed a termination petition (First Termination Petition), asserting that Claimant had fully recovered from the May 6, 2011 work injury based on the results of an independent medical examination (IME) performed by Richard Schmidt, M.D., on March 24, 2017. C.R., Item No. 32, January 23, 2018 WCJ Decision (Second WCJ Decision), at 3, F.F. No. 5. Judge Stapleton accepted Dr. Schmidt's opinion that Claimant had fully recovered from his work injury, "with the exception of [the] injury to his right knee[.]" *Id.*, F.F. No. 15. As to Claimant's right knee injury, Judge Stapleton noted that Claimant underwent three surgeries to his right knee, resulting in a "permanent alteration [of its] anatomy," and Claimant credibly testified that he continued to suffer pain and instability in his right knee. *Id.*

---

[2] Section 1602 of the Act, added by the Act of November 9, 2006, P.L. 1362, 77 P.S. § 2702, establishes the Fund for the purpose of paying a claimant workers' compensation benefits where the employer that is otherwise liable for those benefits has failed to obtain insurance for workers' compensation liability.

2

Based on Claimant's testimony, Judge Stapleton rejected Dr. Schmidt's opinion that Claimant had fully recovered from his right knee injury, and he credited the testimony and opinions of Lewis Sharps, M.D., Claimant's medical expert and treating physician, that Claimant had not fully recovered from the May 6, 2011 work injury to his right knee and he was not capable of returning to his pre-injury job. *Id.* Accordingly, Judge Stapleton denied and dismissed the First Termination Petition.[3] Second WCJ Decision at 10.

## B. Second Termination Petition

Following an IME performed on August 22, 2018, by Eugene Elia, M.D., the UEGF filed a second termination petition alleging that Claimant had fully recovered from his May 6, 2011 work injury and could return to unrestricted work (Second Termination Petition).[4] C.R., Item No. 2. Claimant denied the allegations. *Id.*, Item No. 4.

The UEGF presented the deposition testimony and IME report of Dr. Elia, and surveillance footage of Claimant allegedly taken in June 2019, as well as a report summarizing the footage. Claimant presented Dr. Sharps' October 17, 2017 deposition testimony from the first termination proceeding, as well as Dr. Sharps' testimony from a second deposition that took place on March 26, 2019. Claimant also presented the transcript of his May 17, 2017 testimony from the first termination

---

[3] It does not appear from the record that the UEGF appealed this decision.

[4] Employer did not participate in any proceedings for the Second Termination Petition. During a May 14, 2019 status hearing, Judge Knox noted that all notices sent to Employer were returned as undeliverable, and Employer was no longer represented by its counsel from earlier proceedings. C.R., Item No. 13 at 5. Employer failed to file a brief in this matter as directed by an August 12, 2021 order of this Court. Accordingly, a December 1, 2021 *per curiam* order of this Court precluded Employer from filing a brief or participating in oral argument.

proceeding. Claimant did not testify during any proceedings held on the Second Termination Petition.

### 1. Employer's Evidence

Dr. Elia, an orthopedic surgeon, testified that Claimant presented at the August 22, 2018 IME with complaints of pain and instability in his right knee. C.R., Item No. 21, Elia deposition at 13. Claimant related that he was "basically" sedentary at home, and he had difficulty kneeling and climbing stairs. *Id.* He took Advil for pain. *Id.* Dr. Elia understood that Claimant injured his right ACL prior to the May 6, 2011 work injury, but Claimant asserted that he had no issue with his right knee prior to that date. *Id.* at 13-14.

Dr. Elia noted that Claimant did not wear a brace or use an assistive device to walk. *Id.* Claimant expressed tenderness along the inside of his right knee but none under the kneecap, and Dr. Elia did not observe any crepitus in the right knee. *Id.* at 14-15. Dr. Elia found no evidence of effusion, synovitis, or erythema on or around Claimant's right knee. *Id.* at 15. Initially, Claimant's range of motion for the right knee was slightly less than the left knee. *Id.* at 16. Claimant's range of motion was normal when Dr. Elia tested it a second time during a later part of the IME, which Dr. Elia felt suggested Claimant had magnified his symptoms. *Id.* Although Claimant exhibited slightly diminished strength in his right leg, Dr. Elia did not detect any muscular atrophy. *Id.* Dr. Elia opined that Claimant's physical exam was "basically normal." *Id.* at 17.

As part of the IME, Dr. Elia reviewed Claimant's medical records, including diagnostic studies and surgical reports that documented his treatment from the date of his initial work injury on May 6, 2011, through November 2017. C.R., Item No. 29, at 3-7. In an August 5, 2015 office note, Dr. Sharps stated that Claimant was

"doing well with no significant complaints." *Id.* at 4. Claimant was advised to resume physical therapy and follow up in six months. *Id.* When Claimant returned to Dr. Sharps' practice in April 2017, x-rays revealed "some arthritis in the [right] knee," which was not significant or severe. *Id.* at 20. An April 26, 2017 office note by Dr. Sharps indicated that Claimant had some mild residual laxity in his right ACL, but that most of his pain symptoms were "secondary to the early arthritis in his knee." *Id.* Karl Rosenfeld, M.D., another physician in Dr. Sharps' practice, related in a May 3, 2017 office note that he did not detect any instability in Claimant's right knee or laxity in his ACL. *Id.* at 21. Dr. Rosenfeld felt that the repair to Claimant's right knee was stable, and that Claimant did not require further surgical repair to his ACL. *Id.* at 22. Dr. Rosenfeld felt that the cause of Claimant's right knee symptoms was "most likely degenerative[,]" and a second set of x-rays revealed "early lateral compartment osteoarthritis." *Id.* Dr. Elia stated that these findings indicated the "earliest signs of arthritis within a joint[,]" which he did not relate to Claimant's work injury. *Id.* A September 26, 2017 magnetic resonance image (MRI) of Claimant's right knee confirmed Dr. Rosenfeld's belief that Claimant's right knee ACL repair was intact. *Id.* at 24. The MRI also revealed "early arthritis" along the lateral aspect of Claimant's right knee. *Id.* Approximately one year later, another physician in Dr. Sharps' practice, James Shaffer, M.D., stated in an October 2, 2018 office note that Claimant's right knee was normal on physical examination, although Claimant expressed pain on initiation of movement. C.R., Item No. 26. Dr. Shaffer did not observe any crepitus in the right knee; however, x-rays documented "[s]evere right knee osteoarthritis[,]" which indicated the need for a total right knee replacement. *Id.*

Based on his review of Claimant's medical records and the physical examination he performed on August 22, 2018, Dr. Elia opined that Claimant had fully recovered from the May 6, 2011 work injury to his right ACL, and the medical evidence contained no objective findings to support Claimant's right knee symptoms. C.R., Item No. 29, Elia deposition at 29. Dr. Elia did not relate Claimant's right knee osteoarthritis to the May 6, 2011 work injury. *Id.* He opined that posttraumatic arthritis progresses rapidly after the initial onset, and Claimant's diagnostic studies from 2011 through 2017 showed minimal progression of the arthritis in his right knee. *Id.* at 29-30. Dr. Elia found no evidence to suggest that Claimant's initial injury from May 6, 2011, led to, aggravated, or accelerated the progression of any arthritis in Claimant's right knee. *Id.* at 30.

During cross-examination, Dr. Elia agreed that Claimant's right ACL would have been less structurally sound after the May 6, 2011 work injury, and the surgical procedures performed on Claimant's right knee would have "permanently changed [its] internal structures[.]" *Id.* at 36, 38. He opined, however, that such changes did not preclude Claimant's full recovery from his ACL repair or his return to work. *Id.* at 44.

The UEGF submitted surveillance footage of Claimant from June 2019, and a written report summarizing the footage. C.R., Item Nos. 23-24. The UEGF also submitted copies of Claimant's driver's licenses to establish Claimant was the individual depicted in the surveillance footage. *Id.*, Item No. 27. On the morning of June 4, 2019, Claimant was observed exiting his residence and descending steps while carrying a bicycle, which he then rode for approximately 20 blocks. *Id.*, Item No. 23 at 2. Claimant did not appear to use any braces or aids during this activity. *Id.* On June 19, 2019, Claimant was observed pushing a bicycle as he returned to

his residence shortly before 9:00 a.m. *Id.* Claimant left the residence just before noon, and was observed riding his bicycle to the bank and several stores before returning to the residence. *Id.* Claimant was also observed dancing and carrying his bicycle down the front steps of the residence, which he ascended and descended multiple times. *Id.* He did not appear to use any braces or other aids during this activity. *Id.*

### 2. Claimant's Evidence

At a May 10, 2017 hearing conducted during the first termination proceeding, Claimant testified that he was not able to resume his pre-injury job, as he could not climb a ladder or walk more than a few blocks without experiencing pain in his right knee. C.R., Item No. 25, Notes of Testimony (N.T.), 5/10/17, at 13. Claimant also related that his right knee was not stable enough to support him. *Id.* He stated that he uses a cane when walking more than a few blocks. *Id.* at 14. Claimant did not use a brace any longer, as he felt it prevented him from moving his leg. *Id.* Claimant experienced constant throbbing on the inside of his right knee, as well as sharp pain that would shoot down from his knee to his calf. *Id*. at 20-21. He took Tylenol for pain and performed stretching exercises. *Id.* at 18.

Claimant admitted on cross-examination that he did not seek treatment for issues related to his right knee between March 2015 and April 2017. *Id.* at 16. He advised that he stopped attending physical therapy after he reinjured his ACL during one session. *Id.* at 17.

Dr. Sharps testified by deposition on October 17, 2017. According to Dr. Sharps, he first examined Claimant on January 7, 2015, at which time Claimant presented with persistent pain and instability in his right knee.[5] C.R., Item No. 22,

---

[5] Because the issue before this Court relates to whether Claimant fully recovered from his right knee injury, we will not summarize the testimony relating to his other injuries.

7

Sharps deposition, 10/17/17, at 10. Dr. Sharps understood that Claimant suffered a torn right ACL at the age of 10 or 11. *Id.* Following the May 6, 2011 work injury, Claimant underwent a second right ACL surgery on May 7, 2011. *Id.* While attending physical therapy for the May 7, 2011 ACL surgery, Claimant reinjured his right ACL. *Id.* at 10. Dr. Sharps related the second and third ACL tears to the May 6, 2011 work injury. *Id.* at 14-15. Dr. Sharps' initial impression was that Claimant was "[ACL] deficient, and that he had [developed] an element of traumatic degenerative disease within the right knee." *Id.* Dr. Sharps performed an arthroscopic evaluation of Claimant's right knee on February 19, 2015, during which he surgically repaired Claimant's ACL and a meniscal tear. *Id.* at 17. Dr. Sharps noted the presence of degenerative disease within the knee that was not sufficient to warrant a knee replacement. *Id.* A subsequent arthroscopic surgery on July 23, 2015, indicated an intact right ACL and "Grade 2 to 3 degenerative disease under [Claimant's] kneecap." *Id.* at 18.

Dr. Sharps next examined Claimant on April 26, 2017, at which time x-rays revealed a progression of Claimant's "lateral compartment arthritis[.]" *Id.* Based on Claimant's continued pain symptoms and instability in his right knee, Dr. Sharps referred Claimant to another surgeon for a possible right knee replacement. *Id.* at 19. Although Dr. Sharps did not consider Claimant totally disabled, he did not believe Claimant could return to his pre-injury job. *Id.* at 20. Dr. Sharps agreed that Claimant's primary issue throughout his course of treatment related to the reconstruction of Claimant's right ACL. *Id.* at 24. Dr. Sharps stated that a total right knee replacement would stabilize Claimant's knee independent of the ACL, which would be removed as part of the procedure. *Id.* at 34-35. Therefore, a total knee replacement was presented as a treatment option to correct the residual issue with

8

Claimant's right ACL. *Id.* at 35. Dr. Sharps reiterated his belief, however, that the degenerative progression in Claimant's right knee had a "traumatic component to [it.]" *Id.* at 38.

During his March 26, 2019 deposition, Dr. Sharps related that Claimant was last seen in his office on October 2, 2018. C.R., Item No. 16, Sharps deposition, 3/26/19, at 18. He opined that Claimant sustained "traumatic arthritis of the right knee" as a result of the May 6, 2011 work injury, which progressed to the point where Claimant required a total right knee replacement. *Id.* at 20-21. Dr. Sharps did not believe Claimant could fully recover from the May 6, 2011 work injury without undergoing a total right knee replacement. *Id.* at 21.

Dr. Sharps acknowledged during cross-examination that Claimant did not treat with his practice between August 5, 2015, and April 7, 2017, and Dr. Sharps last examined Claimant on April 27, 2017. *Id.* at 29, 38.[6] Dr. Sharps disagreed that Claimant's subjective complaints of pain were not substantiated by objective findings, as the office notes from Claimant's other treating physicians indicated he had limited range of motion and crepitus in his right knee. *Id.* at 36. He conceded that his opinion of Claimant's condition was based solely on his review of Claimant's medical records prior to November 2017, and he had not personally examined Claimant since April 27, 2017. *Id.* at 38-39. Claimant's failure to actively treat the condition of his right knee did not alter Dr. Sharps' opinion that Claimant had not fully recovered from the May 6, 2011 work injury, and that Claimant needed a total right knee replacement. *Id.* at 41.

---

[6] Interestingly, Claimant resumed treatment with Dr. Sharps on the same day that the UEGF filed its first termination petition.

### 3. Judge Knox's Decision

In a July 30, 2019 ruling, Judge Knox admitted the UEGF's surveillance evidence, as well as the copies of Claimant's driver's licenses. C.R., Item No. 33. Judge Knox inferred that Claimant had no objection to the admission of those exhibits based on his failure to appear and testify at either the May 14, 2019 or June 25, 2019 hearings. C.R., Item No. 33.

On December 30, 2019, Judge Knox circulated his decision granting the UEGF's termination petition. C.R., Item No. 6. Judge Knox found that Claimant was the person depicted in still photographs taken from the June 2019 surveillance footage, during which Claimant carried a bicycle up and down steps, walked and pushed the bicycle, and peddled it for 20 blocks, all without use of any brace or aid. F.F. Nos. 8-9. The June 2019 surveillance footage demonstrated that Claimant could ride a bicycle with no apparent difficulty, despite the complaints of pain he previously reported to his treating physicians and to Dr. Elia. F.F. No. 14.

Based on this evidence, Judge Knox dismissed Claimant's right knee complaints as not credible, and he rejected Dr. Sharps' opinion regarding Claimant's severe pain symptoms. *Id.* Judge Knox credited Dr. Elia's opinion that Claimant's degenerative arthritis was a natural progression and unrelated to Claimant's May 6, 2011 work injury. *Id.* Claimant's most recent surgery took place in 2015, approximately 16 months prior to Dr. Sharps' most recent evaluation and 3 years prior to Dr. Elia's IME. *Id.* Accordingly, Judge Knox found that Claimant had fully recovered from his May 6, 2011 work injury, and specifically from any right knee injury, as of the August 22, 2018 IME. *Id.*

10

Claimant appealed to the Board, which affirmed. C.R., Item No. 9. On appeal,[7] Claimant argues that Judge Knox's decision granting the Second Termination Petition contradicts the judicial determinations made in Judge Stapleton's prior decision dismissing the First Termination Petition.

## II. Discussion

To succeed in a termination petition, an employer bears the burden of proving by substantial evidence that a claimant's disability ceased or that *any remaining conditions are unrelated to the work injury*. *Westmoreland County v. Workers' Comp. Appeal Bd. (Fuller)*, 942 A.2d 213, 217 (Pa. Cmwlth. 2008) (emphasis added). Where a prior termination petition has been filed, the employer must demonstrate a change in the claimant's physical condition since the last disability determination. *Lewis v. Workers' Comp. Appeal Bd. (Giles & Ransome, Inc.)*, 919 A.2d 922 (Pa. 2007). It is not sufficient for an employer to merely challenge the diagnosis of a claimant's injuries as determined in a prior proceeding. *Id.* at 928. Rather, an employer must present medical proof of a change in the claimant's physical condition that has effectuated a change in the claimant's disability, i.e., the loss of his earning power. *Id.* at 926. The employer must accept the claimant's prior adjudicated condition and work forward in time to show full recovery at a later date. *Folmer v. Workers' Comp. Appeal Bd. (Swift Transp.)*, 958 A.2d 1137, 1143-44 (Pa. Cmwlth. 2008). A simple finding that the claimant has fully recovered is insufficient. *Delaware County v. Workers' Comp. Appeal Bd. (Browne)*, 964 A.2d 29, 36 (Pa. Cmwlth. 2008).

---

[7] Our review is limited to determining whether the WCJ's findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. *Prebish v. Workers' Comp. Appeal Bd. (DPW/Western Church)*, 954 A.2d 677, 681 n.1 (Pa. Cmwlth. 2008).

11

Claimant argues that, in granting the Second Termination Petition, Judge Knox ignored the judicial determinations made by Judge Stapleton when he dismissed the First Termination Petition. In that matter, Judge Stapleton credited the opinions and testimony of Dr. Sharps, who relevantly identified degenerative arthritis in Claimant's right kneecap during a February 19, 2015 arthroscopic surgery. From this finding, Claimant contends that Judge Stapleton judicially determined that the May 6, 2011 work injury worsened the degeneration in Claimant's right knee. As the UEGF failed to present evidence demonstrating that the degeneration in Claimant's right knee had resolved, Claimant submits that Judge Knox's decision fails to comport with the Supreme Court's holding in *Lewis*. Claimant also notes that Dr. Elia acknowledged during his testimony that Claimant's right ACL reconstruction rendered his ACL less structurally sound, and the internal structure of his right knee was permanently changed as a result of the surgeries performed. Therefore, the record does not support a finding that Claimant fully recovered from his May 6, 2011 work injury.

At the outset, it is important to note that at no point in the current or prior proceedings did Claimant's work injury include a diagnosis of degenerative arthritis in his right knee. In his decision denying the UEGF's First Termination Petition, Judge Stapleton found that Claimant's injuries from the May 6, 2011 work injury had resolved, with the exception of the injury to his right knee. C.R., Item No. 32, Second WCJ Decision, F.F. No. 15. That injury, per Judge Stapleton's first decision circulated on October 22, 2013, consisted of "a rupture of the infrapatellar tendon in [Claimant's] right knee [and] an injury to [his] previously reconstructed [right ACL]." *Id.*, F.F. No. 3. In summarizing Dr. Sharps' testimony, Judge Stapleton noted that he found evidence of "Grade 2 to Grade 3 degenerative disease" under

12

Claimant's right kneecap during the July 23, 2015 arthroscopic surgery. *Id.*, F.F. No. 11. Judge Stapleton did not, however, either implicitly or explicitly expand the description of Claimant's May 6, 2011 work injury to include traumatic degenerative arthritis in Claimant's right knee or any aggravation of a preexisting degenerative condition in that knee.[8] As a result, the UEGF was not required to prove that Claimant's right knee degenerative arthritis had fully resolved.

Claimant's argument largely relies on the Supreme Court's decision in *Lewis*. In this opinion, Robert Lewis (Lewis) suffered a work injury as the result of a forklift accident. 919 A.2d at 923-24. Lewis's employer recognized his injury and paid benefits for approximately two years by means of a notice of compensation payable (NCP). *Id.* at 924. Beginning in 1990, and over the course of 12 years, Lewis's employer filed four termination petitions, the first three of which were denied. *Id.* Lewis's employer filed the fourth petition three days after the Board affirmed a WCJ's denial of the third petition. *Id.* A WCJ granted the fourth termination petition after crediting the testimony of the employer's expert witness and finding that Lewis had fully recovered from his work-related injuries. *Id.* The Board affirmed the WCJ. *Id.* This Court affirmed the Board. *Id.* The Supreme Court reversed on the basis

---

[8] Section 413 of the Act, 77 P.S. § 772, provides in relevant part that a WCJ may modify the decision of a WCJ, upon petition filed by either party, upon proof that a claimant's disability has increased. Due process, however, requires that an opposing party receive prior notice and an opportunity to contest the corrective amendment. *Cinram Mfg., Inc. v. Workers' Comp. Appeal Bd. (Hill)*, 975 A.2d 577, 582 (Pa. 2009). In *Cinram*, the claimant's work injury was originally described in a notice of compensation payable (NCP) as a lumbar strain. During a termination petition, the claimant's medical expert testified that the work injury aggravated a preexisting disc herniation, causing nerve impingement. The WCJ credited the evidence, denied the termination petition, and amended the NCP to include nerve impingement. Our Supreme Court affirmed the corrective amendment, noting that the employer's experts addressed nerve impingement in their testimony and opined that it was unrelated to the work incident. The instant record contains no support for a conclusion that Claimant's injury was expanded to include right knee degenerative arthritis.

13

that the employer's expert failed to demonstrate Lewis's physical condition had changed since the last adjudication. *Id.* at 929. Section 413 of the Act, 77 P.S. § 772, provides that a claimant's benefits may be modified or terminated based on a change in disability. The Supreme Court held that "by natural extension . . . where there have been prior petitions to modify of terminate benefits, the employer must demonstrate a change in physical condition since the last determination." 919 A.2d at 926.

Instantly, we reject Claimant's argument that Judge Knox's December 30, 2019 decision fails to comport with *Lewis.* Claimant credibly testified as part of the First Termination Petition that he could not walk more than a few blocks without pain. Judge Knox found that Claimant had fully recovered in great part due to the surveillance footage, which demonstrated that Claimant could ride a bicycle and walk steps with no apparent difficulty. This evidence led to Judge Knox's findings that Claimant's subjective complaints of pain were not credible, which necessarily implicated Dr. Sharps' opinion regarding Claimant's severe pain symptoms. Dr. Elia credibly testified that Claimant's ACL repair remained intact, an opinion supported by Claimant's diagnostic studies. While Dr. Elia agreed during cross-examination that Claimant's right ACL reconstruction rendered his ACL less structurally sound, and the internal structure of his right knee was permanently changed as a result of the surgeries performed, he also opined that these facts did not preclude Claimant's full recovery from the surgical repair necessitated by the May 6, 2011 work injury or his return to work.

Substantial evidence supports Judge Knox's findings that Claimant's physical condition changed from January 23, 2018, the date that Judge Stapleton denied the

First Termination Petition, and August 22, 2018, the date of Dr. Elia's IME. Accordingly, we affirm the Board.

_____
ELLEN CEISLER, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Thomas Farrier,              :
          Petitioner    :
                           :
      v.               :  No. 74 C.D. 2021
                           :
Lee's Painting and Roof Coating  :
(Workers' Compensation Appeal  :
Board),                     :
          Respondent  :

## **O R D E R**

AND NOW, this 22nd day of March, 2022, the December 29, 2020 order of the Workers' Compensation Appeal Board is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge